IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRIAN K. SHERRELL,

     Plaintiff,

                                   CV 10-278-PK

                                   FINDINGS AND

v.                                  RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

---

PAPAK, Magistrate Judge:

     Plaintiff Brian K. Sherrell filed this action March 15, 2010, seeking judicial review of the Commissioner of Social Security's final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act").  This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

Page 1 - FINDINGS AND RECOMMENDATION

Sherrell argues that by erroneously rejecting medical evidence, the Commissioner failed properly to assess his residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and thereby failed to carry his burden at step five of the process. I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

Page 2 - FINDINGS AND RECOMMENDATION

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained,

work-related, physical and mental activities on a regular and continuing basis,[1] despite the

limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a);

*see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the

claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§

404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that

the claimant can still perform his or her past relevant work, the claimant will be found not

disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f),

416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or

her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden

of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the

claimant's age, education, and work experience to determine whether the claimant can perform

any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142;

*see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v),

416.920(g), 416.960(c), 416.966. If the Commissioner meets its burden to demonstrate that the

claimant is capable of performing jobs existing in significant numbers in the national economy,

the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20

C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g),

416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an
equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

meet its burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id., citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id., citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Sherrell was born April 8, 1968. Tr. 26, 123, 129.[2] He received a General Educational

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

Development high school equivalency diploma in 1982, and has received no subsequent formal education. Tr. 27, 157-166. According to Sherrell's records of wages earned, prior to his claimed disability onset date of March 1, 2005, Sherrell worked for the Tum-a-Lum Lumber Company in 1985 (earning $631.50) and 1986 (earning $125.00), for C. K. Benton Orchards (earning $340.00) and River's Edge Towing (earning $455.00) in 1986, for Da Kine Hawaii in 1987 (earning $9,748.43) and 1988 (earning $7,983.01), for Yaya's International Restaurant (earning $359.00) and Gorge Technology (earning $164.44) in 1989, for Northwave Wind Sports (earning $1,625.00) and Norlin (earning $98.00) in 1990, for Jack's Auto Body in 1992 (earning $119.00), for Shred Alert in 1996 (earning $8,858.18) and 1997 (earning $2,813.71), for Guinett Masonry (earning $300.00), Labor Ready (earning $158.00), E. N. Brown & Company (earning $1,898.75) and Century Gutter and Sheet Metal (earning $1,747.50) in 1998, for E. N. Brown & Company in 1999 (earning $37,921.81) and 2000 (earning $1,242.00), for J. A. Brown Company in 2000 (earning $252.00), and for Aloha Floor & Window Covering in 2001 (earning $982.80). Tr. 132-137. Following his claimed disability onset date, Sherrell worked for the Pheasant Valley Vineyard and Winery and for the related employer Pheasant Valley Orchards in 2005 (earning $2,761.00) and 2006 (earning $2,341.00). Tr. 132, 137. Sherrell did not work in 1991, 1993-1995, 2002-2004, or 2007-2008 (2008 is the last year for which earnings data are available in the record). Tr. 132, 135, 137.[3]

---

[3] According to Sherrell's testimony, he was incarcerated for an unspecified period at age 20 following his conviction for delivery of cocaine in approximately 1988, for an additional unspecified period following his conviction for armed robbery approximately fifteen years prior to 2009 (possibly corresponding to the 1993-1995 hiatus in his employment records), and for approximately 14 months in 2004 and 2005 following his conviction for assault and possession of methamphetamine. Tr. 39-40.

At a hearing before the Administrative Law Judge, Sherrell testified that he last worked in 2002, Tr. 26-27, and later testified that he had not performed any more recent paid work, "not even part time," Tr. 30-31, but upon being confronted by the ALJ with the records of his employment by Pheasant Valley in 2005 and 2006, acknowledged that he had worked in both the winery and the orchard in those years, Tr. 31. He testified that in that employment he worked 12-30 hours a week for a period of approximately ten months, drove a tractor, did construction work, and lifted fifty or sixty pounds at least occasionally (and approximately 80 pounds with the aid of "leverages and levers"). Tr. 31-33. By contrast, in a Work Activity Report submitted to the Administration, Sherrell indicated that he worked an average of 10 hours per week at Pheasant Valley. Tr. 145.

According to Sherrell's further testimony, he lived in Hawaii for over a year in approximately 2001 for the purpose of rehabilitation. Tr. 33. His employment by Aloha Floor & Window Covering in 2001 took place in Hawaii, was part time, and required him to lift up to 150 pounds. Tr. 33, 36. While in Hawaii he paid for his lodging by working for the owners of the property where he was staying, "[m]owing the grass, picking up water lines and replacing them, planting trees, planting bananas and mangoes . . . , weeding. A lot of weeding . . . . A lot of clearing jungle." Tr 36, 37.

Sherrell further testified that his employment by E. N. Brown & Company and related employer J. A. Brown Company in 1998, 1999, and 2000 (which Sherrell characterized as enduring for "three or four years" until approximately 2002) was as a glazier, and required him to lift over 100 pounds at least occasionally. Tr. 28. Sherrell testified that he left that employment because "We ran out of work. I got, I couldn't do it anymore." Tr. 28. Sherrell further testified

that prior to becoming a glazier, he "ran gutter companies" from approximately 1995 to 2000

(although his earnings records indicate only one employer in the business of installing gutters,

Century Gutter and Sheet Metal, by which Sherrell was employed briefly in 1998), Tr. 29, in

which employment he lifted 40 to 50 pounds at least occasionally, Tr. 30.

Sherrell further testified that prior to his experience installing gutters he worked in

construction, "usually full time" (although this characterization is very much at odds with his

earnings records) beginning in approximately 1988, lifting over 100 pounds at least occasionally

in that employment. Tr. 28. He specifically testified that his brief employment in 1998 by Labor

Ready and Guinett Masonry was in construction, and that his brief employment by Shred Alert in

1997 required him to cut material for the purpose of making hats, and to lift 30 or 40 pounds. Tr

34-35.

The administrative record does not contain an extensive corpus of medical records dating

from prior to March 1, 2005, Sherrell's claimed disability onset date. Various records

nevertheless indicate that Sherrell was involved in a motor vehicle accident in 1986, when he

was 18 years old, resulting in complete right acromioclavicular joint separation and secondary

chronic pain, although the record contains no records contemporaneous with the accident. Tr.

266, 264.

The earliest medical report appearing in the administrative record, other than documents

relating to Sherrell's registration as a medical marijuana patient, is dated January 26, 2004. Tr.

266. On that date, Sherrell met with his treating physician Constance Serra, M.D., to fill out

medical marijuana paperwork. Tr. 266. Serra noted that Sherrell's blood pressure was elevated,

and discussed lifestyle changes (decreasing alcohol and cigarettes, decreasing salt, and eating a

Page 8 - FINDINGS AND RECOMMENDATION

healthy diet) to improve his hypertension, although she indicated that he already engaged in adequate levels of physical activity. Tr. 266.[4]

On March 12, 2004, Sherrell presented at Serra's offices to request narcotics for his chronic right shoulder pain. Tr. 274. On that occasion, Sherrell reported to Mark Press, F.N.P., that in connection with his previous surgery for acromioclavicular joint separation, he had been "told by a surgeon that he would have the most pain that a human can experience and he should expect to get Morphine whenever he wants." Tr. 274. Although Sherrell advised Press that he usually controlled his pain with medical marijuana, he indicated that he was about to be incarcerated (presumably in connection with his conviction for assault and possession of methamphetamine) and would therefore be unable to obtain marijuana for a period of time. Tr. 274. Press indicated that he was uncomfortable with prescribing narcotics on the basis of Sherrell's report, and recommended that Sherrell first consult either with Serra or with orthopedist Trey Rigert, M.D. Tr. 274. In the interim, Press recommended that Sherell control his pain symptoms with ibuprofen, Tr. 274, and also prescribed Sherrell "well padded shoes" for "medical reasons," Tr. 259.

On April 1, 2004, Sherrell consulted with Rigert as Press had recommended. Tr. 273. Rigert described Sherrell as "a well developed male with minimal pain behaviors. Bright affect." Tr. 273. According to Rigert, Sherrell was "able to give an accurate and cogent description of recent events, however, he [wa]s fairly elaborative when describing his discussions on

---

[4] Serra further indicated that Sherrell smelled of marijuana smoke during their consultation, Tr. 266, an observation that may call into question Sherrell's testimony that, although he smokes marijuana every day and gets around by car, he always waits four hours after smoking before driving, Tr. 45.

expectations of chronic pain around the time of his orthopedic surgery," referring apparently to

Sherrell's acromioclavicular joint separation surgery in or around 1986. Tr. 273. As to Sherrell's

expectations of chronic pain, Rigert reported that Sherell advised him "that he was told to expect

chronic pain over the years, however, [Rigert's] experience with these injuries has been that they

generally do fairly well. . . ." Tr. 273. Rigert opined that Sherrell had "some degree of atrophy in

the right biceps compared to the left, however, they are both very well developed. He has limited

abduction to 120 degrees on the right compared to the left. . . . Grip strength is 5/5/ biceps and

5/5 triceps." Tr. 273. Rigert ordered an X-ray study of Sherrell's right shoulder, although it

appears that this study did not take place prior to Sherrell's incarceration. Tr. 273, 259.

Sherrell's records indicate that he sought medical care on several occasions while

incarcerated in Oregon State Penitentiary in 2004 and 2005.[5] On June 2, 2004, Sherrell requested

and apparently received a bottom bunk due to "chronic injuries and pain." Tr. 233. Sherrell

complained of chest pains on July 26, 2004, sprained his ankle playing volleyball on September

27, 2004, and on September 30, 2004, made his way to the prison clinic "on crutches" requesting

that his "lay in" be extended, presumably in connection with his sprained ankle. Tr. 232. On

June 28, 2005, Sherrell requested "medical showers" on the grounds that he had a rash on his left

arm, dandruff, and smelly feet. Tr. 228. Medical staff opined that the rash was minimal, that no

dandruff could be detected, and that Sherrell's feet smelled "OK," and apparently on that basis

concluded that Sherrell's request was "a con" and denied it. Tr. 228.

---

[5] It appears that Sherrell was incarcerated on his claimed disability onset date of March 1, 2005. There is no indication that Sherrell sought medical care on or around that date, that his medical condition deteriorated on or around that date, or that he received any diagnosis at any time suggesting any material change in his medical condition on or around that date.

On October 6, 2005, Sherrell – apparently having been released from the O.S.P. –
consulted with Serra, complaining of increased right shoulder and right knee pain.  Tr. 270-271.
At that time Sherrell requested a prescription for marinol, apparently on the grounds that he
might be unable to use medical marijuana while on parole and because "if he ends up
incarcerated again (for THC in urine) he does not want to be without medication."  Serra renewed
Sherrell's medical marijuana registration and prescribed marinol.  Tr. 271.  In addition, Serra
ordered X-ray studies of Sherrell's right shoulder and right knee, in part to "follow through" on
Rigert's recommendations.  Tr. 271.

Sherrell underwent the X-ray studies on October 28, 2005.  Tr. 242-244.  The study of his
right shoulder revealed no pathology of any kind, whereas the study of his right knee revealed
only "mild lateral joint space narrowing and . . . minimal marginal spur formation, most marked
about the patella.  No fracture or other acute osseous abnormality is identified."  Tr. 242-244.

Apparently once again incarcerated, this time in the Northern Oregon Regional
Corrections Facility ("NORCOR"), on January 1, 2006, Sherrell complained to NORCOR
medical staff of pain and muscle spasms, as well as nausea secondary to hepatitis B (which
Sherrell apparently believed had been diagnosed at some previous time).  Tr. 254-255.
NORCOR staff performed blood tests, which revealed "only the tiniest trace of liver
inflammation," and after consulting the X-ray studies of October 2005 opined that Sherrell's right
shoulder "was perfectly normal" and that his right knee showed signs of "only mild arthritis."  Tr.
254.  Sherrell was advised, "You seem in better shape than you think."  Tr. 254.

A NORCOR Medical Condition/Health History Profile dated January 27, 2006, indicates
that Sherrell believed he had been diagnosed with hepatitis B "when young," that he advised

NORCOR staff that he "did not receive medical care while at O.S.P. but was able to smoke

marijuana daily so didn't need other attention," and that he was using alcohol for pain control and

to "catch a buzz." Tr. 253. While still housed at NORCOR, Sherrell underwent blood tests in

connection with his hepatitis symptoms on January 30, 2006. Tr. 247-251, 258. These tests

revealed the presence of hepatitis C antibodies in Sherrell's blood, but indicated the absence of

antibodies for chronic hepatitis B. Tr. 247-251, 258.

Having apparently been released from NORCOR, on February 15, 2006, Sherrell

protectively filed for both DIB and SSI. Tr. 123-128, 129-131.

Sherrell underwent further blood tests at Serra's direction on February 20, 2006, which

revealed elevated liver enzyme (AST and ALT) levels indicative of hepatitis C. Tr. 257, 265,

267-269. On March 1, 2006, blood tests revealed an absence of antibodies to hepatitis B. Tr.

256.

In a Disability Report (Form SSA-3368) dated March 1, 2006, Sherrell listed his

allegedly disabling conditions as "Hep[atitis] C, shoulder, back & knee injuries, arthritis," and

responded to the question, "How do your illnesses, injuries, or conditions limit your ability to

work" as follows:

> Energy level is terrible. I feel flu like all the time. I feel sick 24/7 and I have no
> energy. I am on the couch for days at a time. I sometimes vomit in the mornings
> lately. The previously crushed r[igh]t shoulder limits my right side movements.
> The biggest problem is the pain. I can't do any work over my head. I can't lift
> over 100 lbs. If I lift something heavy I can't carry it. I can't do any repetitive
> lifting chores. I can't bring firewood into the house more than one time. Then I
> have to rest until strain goes away — days to weeks to months. I am on medical
> marijuana which limits the things I can be hired to do. It also limits the employers
> who will hire me. I can stand for just a few minutes before I have to rest. My
> right knee has arthritis and is painful. I can't bend much or crouch.

Tr. 157-166. In a Function Report dated March 15, 2006, Sherrell indicated that he lived in a

Page 12 - FINDINGS AND RECOMMENDATION

motor home located "out back of friend's house." Tr. 167.  He described his daily activities as

follows:

> Get up, news, stretch, medicate, make daughter breakfast, get her off to school,
> clean a little, meeting, appointments, eat, read, daughter home from school, make
> dinner, homework, meeting, bed.

Tr. 167.  He reported that he was the caretaker for his young daughter and for one of his parents,

and that in addition he took care of a pet dog.  Tr. 168.  He further reported that he was no longer

able to "work for any length of time without pain and sickness" which he claimed he had been

able to do before the onset of his disability.  Tr. 168.  He reported no problems with performing

his own personal care and hygiene, Tr. 168-169, that he prepared his own meals, Tr. 169, that he

was able to do a little regular house-cleaning and his own laundry, Tr. 169, and that he did his

own grocery shopping once or twice a week for food, Tr. 170.  He reported that his condition

prevented him from hiking and fishing, each a pastime he engaged in prior to his claimed

disability onset date, Tr. 171, and affected him in "lifting, squatting, bending, standing, reaching,

walking, sitting, kneeling, talking, stair climbing, memory, completing tasks, concentration,

understanding, following instructions, and using hands," Tr. 172.  He reported being able to walk

one mile before needing to rest.  Tr. 170.

On March 30, 2006, Sherrell consulted with Serra complaining of fatigue, aches, and

light-headedness.  Tr. 292-293.  He reported that he had been "clean of alcohol" since January

2006.  Tr. 292.  Serra opined that his symptoms were likely secondary to his hepatitis C.  Tr. 292.

On April 26, 2006, agency medical consultant Martin Kehrli, M.D., reviewed Sherrell's

medical records and opined that Sherrell's limitations were "non-severe." Tr. 278.  In support of

his opinion, Kehrli noted that in December 2004 Sherrell requested narcotic pain medication in

connection with right shoulder pain although examination of his right shoulder revealed no pain

response on palpitation, no deformities, and full strength and coordination of shoulder and elbow,

that in April 2005 Sherrell reported full independence in his activities of daily living, and that

although in April 2005 some relative atrophy of his right biceps was noted the biceps was

nevertheless noted to be well developed, that the X-ray study of October 2005 revealed no

pathology in Sherrell's right shoulder and only mild arthritis of the right knee, and that the blood

tests of January 2006 revealed only a small trace of liver inflammation. Tr. 278. That same day,

the Administration made an initial determination of non-disability in connection with Sherrell's

SSI claim, Tr. 79, and on April 27, 2006, made an initial determination of non-disability through

the date last insured of December 31, 2005, in connection with his DIB claim, Tr. 80. On April

27, 2006, the Administration notified Sherrell of its adverse determinations. Tr. 83, 84-87, 88,

89-92.

Sherrell met with Susan Witt, L.C.S.W., to discuss his substance abuse issues on May 10,

2006. Tr. 394. Witt crafted a "mental health plan" for Sherrell, pursuant to which he would

refrain from using what she termed "white drugs" and would attend individual and group therapy

on a weekly basis for approximately 13 weeks. Tr. 394. Sherrell met with the social worker for

a follow-up visit again on May 26, 2006, at which time she recommended that he continue

attending outpatient therapy sessions. Tr. 279-282, 390-393.

On June 29, 2006, Sherrell requested reconsideration of the Administration's adverse

determinations of his DIB and SSI claims. Tr. 93-95.

That same day, Sherrell called Serra's offices complaining of nausea, fatigue, and

weakness of over one week's duration. Tr. 291. Five days later, on July 3, 2006, Sherrell was

seen by Brenda Colfelt, M.D., to whom he reported that he had drunk one half of a rum and coke

approximately ten days previously – purportedly his only drink of alcohol in six months – and

that he had felt ill ever since.  Tr. 287-288, 291.  Colfelt ordered liver function tests.  Tr. 287-

288.  The tests revealed elevated levels of AST and ALT.  Tr. 289.  On July 13, 2006, Serra

"initiated" a referral to a hepatologist.  Tr. 286.  That same day, lab tests established that

Sherrell's hepatitis C virus was of genotype 1a, apparently a variant that is not particularly

responsive to interferon therapy.  Tr. 290.

On July 25, 2006, Sherrell filed a Disability Report with the Administration to update his

medical status.  Tr. 188-194.  In that report, Sherrell stated that as of April 1, 2006, he became

sicker, experiencing increased symptoms of fatigue, dizziness, and severe pain.  Tr. 188-194.  On

August 7, 2006, Sherrell filed an updated Function Report indicating that he had moved from a

motor home to a house, describing his daily activities as "take vitamins, eat, mess w/ garden for a

bit, lay [sic] down, watch TV, read, meditate, eat lunch somewhere in their [sic], lay [sic] down,

eat dinner, lay [sic] down," reporting that he remained able to perform his own personal care,

make his own meals, perform some household chores, and do his own grocery shopping, and

stating that he was able to walk only 200 yards before needing to rest.  Tr. 195-202.  That same

day he filed a Claimant Pain Questionnaire in which he described his pain symptoms as "deep

aching pain" located in his "shoulder, back & knee" lasting from "15 minutes to several days"

and occurring "many times a day" as a result of "lifting, moving, working."  Tr. 203-205.

Sherrell indicated in the questionnaire that he took daily walks of one mile, Tr. 203-205, a

statement at odds with his claim of the same date to be able to walk only 200 yards.  Also on that

same day, Sherrell filed an Alcohol and Drug Use Questionnaire in which he indicated that he

stopped using methamphetamine two and one half years previously, stopped using alcohol seven

months previously (other, apparently, than the rum and coke of June 2006), and smoked medical

marijuana for his pain symptoms twice daily. Tr. 206-208. Also on August 7, 2006, Sherrell

filed a Claimant Fatigue Questionnaire in which he indicated that he could be up and active for

20 minutes before needing to rest (but also that he needed to rest after getting up to turn on the

garden hose), that his fatigue symptoms did not permit him to "fish, hike, work, mow yard, kung

fu, lift weights, anything," that he "never" took walks as he had tried several times to do so

without success (a statement at odds with his claim of the same date that he took daily walks of

one mile), that his daily activities could be described as "eat, lay [sic] their [sic], read & TV," that

he could walk zero hours, stand zero hours, and sit one hour before needing to rest, and that he

could occasionally bend and occasionally lift 20 lbs. Tr. 209-212.

On October 10, 2006, Serra completed her referral of Sherrell to hepatologist Kenneth

Flora, M.D., apparently "initiated" July 13, 2006. Tr. 372. Sherrell met with Flora for the first

time on December 6, 2006. Tr. 396-397. Sherrell reported to Flora that he had been drinking a

daily fifth of alcohol as recently as January 2006, but that he had been sober from alcohol for

about seven months (a report at odds with both his indication that he drank half a rum and coke

in June 2006 and with his various claims to have been sober from alcohol for the six months

prior to drinking the rum and coke). Tr. 396-397. Flora, recommended that Sherrell undergo a

liver biopsy. Tr. 396-397. That same day, lab reports confirmed that Sherrell's hepatitis C virus

was of genotype 1a. Tr. 406-412.

Also on December 6, 2006, agency psychiatric consultant Bill Hennings, Ph.D.,

conducted a review of Sherrell's medical records, ultimately opining that Sherrell's psycological

limitations were non-severe. Tr. 295-308. On December 8, 2006, agency medical consultant Richard Alley, M.D., conducted a separate review of Sherrell's medical records, specifically noting the March 2004 exam showing "full strength and coordination" of Sherrell's right shoulder and arm, Sherrell's medical records during his incarceration of 2004-2005, the X-ray study of October 2005 showing no pathology of the right shoulder and only mild arthritis in the right knee, the various lab reports showing only "mild" elevation in liver enzymes ALT and AST, Sherrell's self-report of daily yoga and kung fu, the March 2006 and August 2006 reports of activities of daily living, and the function report that Sherrell was able to lift 100 pounds. Tr. 294. Alley affirmed the prior finding that Sherrell's physical limitations were non-severe. tr. 294. On reconsideration, the Administration affirmed its previous determination of non-disability in connection with Sherrell's DIB and SSI claims effective December 8, 2006, Tr. 81, 82, and on December 11, 2006, advised Sherrell of its adverse decision on reconsideration, Tr. 97, 98-99, 100, 101-102.

On December 13, 2006, Sherrell underwent the liver biopsy recommended by Flora. Tr. 387-388, 398-405. The results of the biopsy were unexpectedly positive, revealing stage 1 fibrosis only, with inflammation at grade 0. Tr. 395. Sherrell agreed to consider interferon therapy. Tr. 395.

Sherrell timely requested a hearing before an Administrative Law Judge on February 15, 2007. Tr. 103.

On March 15, 2007, Sherrell consulted with Serra to follow up on his hepatitis treatment. Tr. 371. Sherrell made the decision to forego interferon therapy in favor of an alternate therapy expected to be approved some time in the near future. Tr. 371. Sherrell also reported symptoms

of anxiety, which Serra opined were most likely a result of his discontinuation of alcohol use, and for which Serra prescribed Lexapro. Tr. 371.

Sherrell was involved in a single-car motor vehicle accident on or around July 9, 2007. Tr. 309-311, 315-343, 377-386. X-ray and CT studies of his chest and abdomen were normal, but a "tox screen" revealed, in addition to THC, the presence of benzodiazapenes in Sherrell's blood for which he had no prescription. Tr. 309-311, 315-343, 377-386. Following his release from hospital, Sherrell returned to the emergency room demanding narcotic pain medications, where he became violent and abusive, throwing things around and yelling. Tr. 312-314. Emergency room personnel called the police in an effort to control Sherrell's behavior. Tr. 312-314. Sherrell received a prescription for vicodin before leaving the ER. Tr. 312-314.

The following day, July 10, 2006, Sherrell arrived at Serra's offices to receive narcotic pain medications. Tr. 369. Upon being asked to wait before receiving his pain medication, Sherrell again became verbally abusive. Tr. 369. Ultimately Sherrell received injections of MS Contin (morphine) and Phenergan. Tr. 369. Sherrell returned to Serra's offices to receive additional injections of MS Contin and Phenergan on July 11, 12, and 13, 2006. Tr. 368-369, 368. On July 13, 2006, Sherrell reported to Serra that his positive test for unprescribed benzodiazapene could be explained by the fact that a friend had recently given him a single Xanax tablet. Tr. 365-367. Serra recommended physical therapy and prescribed oxycodone and ativan to control Sherrell's pain symptoms. Tr. 365-367.

On July 16, 2007, Sherrell underwent an X-ray study of his thoracic spine, revealing only mild degenerative change in the mid and lower thoracic spine, and no other abnormalities or pathology. Tr. 376.

On July 19, 2007, Serra recorded that Sherell reported being able to sleep at night only by taking 10 mg oxycodone, 20 mg flexeril, and 7.5 mg of hydrocodone. Tr. 363-364. Serra noted that Sherrell's physical therapy was scheduled to begin the following day, and refilled Sherrell's pain medications. Tr. 363-364. Sherrell continued controlling his pain symptoms with significant doses of narcotic pain medications through the remainder of July 2007, Tr. 361-362, 360, and through August 2007, Tr. 359, 358, apparently began to taper his dosage in September 2007, Tr. 357, 356, but continued taking narcotic medications through the end of 2007, Tr. 355, 354, 353, 352. On December 4, 2007, Sherrell requested early refill of his pain medication prescriptions, reporting that his medications had been stolen. Tr. 352.

On October 19, 2007, blood tests established that Sherrell's ALT and AST liver enzyme counts were within the normal range. Tr. 375.

On January 17, 2008, and again on March 6, 2008, Sherrell reported to Serra that he was trying to stop using narcotic pain medications, but that he was experiencing withdrawal symptoms whenever he tried to do so. Tr. 350-351, 348-349. Nevertheless, Sherrell reported to Serra on May 8, 2008, that he had been off narcotic pain medications for two months, and that he "absolutely" did not want to return to using narcotics. Tr. 346. Notwithstanding the foregoing, Sherrell received an additional refill of his hydrocodone on May 27, 2008. Tr. 345.

On March 12, 2009, a hearing was held before an Administrative Law Judge. Tr. 22-78. Sherrell and a vocational expert testified at the hearing. Tr. 22-78.

Also on March 12, 2009, Sherrell filled out a Claimant Questionnaire in which he indicated that he was still taking hydrocodone, as well as daily medical marijuana. Tr. 224-227.

On April 30, 2009, Serra wrote a letter to Sherrell's counsel in which she opined as

follows:

> Regarding [Sherrell's] hepatitis C, he does have sort of a chronic low-grade
> fatigue and myalgias that most likely are related to the hepatitis C. He has been
> very good about completely abstaining from alcohol and other liver toxins;
> therefore, his liver enzyme studies have improved over the years, which is good
> news. However, he is still considered to have active hepatitis C.
>
> His other chronic ongoing issue is from a pretty severe motor vehicle accident of
> July 2007. . . . He continues to have . . . chronic pain in his back with recurrent
> muscle spasm, and this is due to the nature of the injury. This is likely going to be
> an ailment that will be an ongoing struggle for him for at least several years to
> come, if not a lifelong struggle to control the musculoskeletal spasm and pain. He
> continues to engage in regular stretching exercises. He uses no narcotic
> medications for pain because he does not tolerate narcotic medications well. He
> does use medical marijuana to help with pain.
>
> Based on these two specific physical conditions, I believe it would be difficult for
> him to sustain long-term employment, as I do not see either condition having
> substantial improvement in the upcoming years. I absolutely do not think he
> should return to his prior trade of carpentry and construction work due to the
> chronic musculoskeletal pain that is likely to be ongoing.

Tr. 413-414.

On June 29, 2009, the ALJ denied Sherrell's applications for DIB and SSI benefits. Tr.

11-21, 8-10. Sherrell timely requested review of the ALJ's decision, Tr. 4, and the Appeals

Council denied his request on January 8, 2010, Tr. 1-3. In consequence, the ALJ's decision of

June 29, 2009, became the Administration's final order for purposes of judicial review. *See* 20

C.F.R. § 422.210(a); *see also, e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action

followed.

### SUMMARY OF ALJ FINDINGS

The Administrative Law Judge noted preliminarily in her June 29, 2009, opinion that

Sherrell's claimed disability onset date was March 1, 2005, and that his date last insured was

December 31, 2005, so that the adjudication period of his DIB application was from March 1 to

Page 20 - FINDINGS AND RECOMMENDATION

December 31, 2005, only, whereas the adjudication period of his SSI application was March 1, 2005, through the present. Tr. 11, 13.

At the first step of the five-step sequential evaluation process, the ALJ found that Sherrell did not engage in substantial gainful activity at any time following his claimed disability onset date. Tr. 12. She therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Sherrell's medical impairments of "cervical and thoracic degenerative disc disease. . . and hepatitis C" were "severe" for purposes of the Act. Tr. 13-14. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Sherrell's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 22. The ALJ therefore properly conducted an assessment of Sherrell's residual functional capacity. Specifically, the ALJ found that during the relevant adjudication period Sherrell had:

> the residual functional capacity to lift and carry between fifteen and twenty pounds occasionally; he can stand and walk for six hours during an eight-hour day; and he can sit for six hours of an eight hour day. Furthermore, he should never kneel or use ladders, ropes or scaffolds, and is limited to occasionally climbing and stooping. The claimant should avoid concentrated exposure to hazardous conditions, including heights and moving machinery.

Tr. 15. In reaching this finding, the ALJ considered all of the material objective medical evidence in the record, as well as Sherrell's own statements regarding his symptoms. Tr. 15-19.

At the fourth step of the five-step process, the ALJ found that Sherrell was unable to perform his past relevant work. Tr. 19-20.

At the fifth step, the ALJ found in light of Sherrell's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that

Page 21 - FINDINGS AND RECOMMENDATION

he could perform. Tr. 20-21. Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled, sedentary jobs that Sherrell could perform despite the limitations listed in his RFC representative occupations including machine tender (380,000 jobs in the national economy and 14,000 jobs in the Oregon economy) or sign painter (138,000 jobs in the national economy and 3,800 jobs in the Oregon economy). Tr. 20-21. Based on the finding that Sherrell could perform jobs existing in significant numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act at any time between March 1, 2005, and June 29, 2009. Tr. 21.

## ANALYSIS

Sherrell challenges the Commissioner's assessment of his residual functional capacity. Specifically, Sherrell argues that the Administrative Law Judge improperly rejected the April 1, 2004, medical opinion of Sherrell's examining physician Rigert and the April 30, 2009, medical opinion of Sherrell's treating physician Serra.[6] Sherrell further argues that the Commissioner failed to carry his burden at the fifth step of the five-step process in light of the alleged errors in the ALJ's assessment of Sherrell's RFC.

It is worth noting as a preliminary matter that Sherrell's claims for benefits have presented the Administration with something of a moving target over the years. As of March 1, 2005, Sherrell's claimed disability onset date, Sherrell's only allegedly disabling symptom was chronic pain secondary to right acromioclavicular joint separation and/or to mild arthritis of the right

---

[6] In an introductory section of his opening brief, Sherrell suggests that he intends, in addition, to argue that the ALJ improperly rejected some aspect of the December 8, 2006, medical opinion of agency consulting physician Alley, but he offers no argument regarding Alley's opinion anywhere in the body of either his opening brief or his reply memorandum.

Page 22 - FINDINGS AND RECOMMENDATION

knee, and the record contains very little evidence that Sherrell's pain symptoms limited him at that time in the ability to engage in gainful activity or in the activities of daily living in any significant way. Shortly before Sherrell protectively applied for benefits in February 2006, he was diagnosed with hepatitis C, and it appears that for some time thereafter his claim of entitlement to benefits was premised chiefly on symptoms of nausea and fatigue secondary to hepatitis. The Administration initially denied Sherrell's claims in April 2006, and denied them again on reconsideration in December 2006. In July 2007, after Sherrell had requested a hearing before an ALJ, Sherrell was in a single-car motor vehicle accident in which he was injured. By the time Sherrell appeared before the ALJ in March 2009, his hepatitis symptoms appeared to be largely under control, and his alleged entitlement to benefits was premised almost exclusively on chronic pain symptoms secondary to the injuries he suffered in the 2007 motor vehicle accident, rather than on any of the grounds that had been before the Administration in April or December 2006.

Rigert's opinion dates from April 2004, and relates exclusively to limitations secondary to Sherrell's 1986 acromioclavicular joint separation. Serra's opinion dates from April 2009, after the hearing before the ALJ had already taken place, and addresses Sherrell's symptoms secondary to hepatitis C and to the injuries sustained in the 2007 motor vehicle accident.

I.    **Residual Functional Capacity**

A.    **April 1, 2004, Medical Opinion of Examining Physician Rigert**

Rigert examined Sherrell on April 1, 2004, after Press, a family nurse practitioner working in Sherrell's treating physician Serra's offices, referred Sherrell to him in connection with Sherrell's request for narcotic pain medications to substitute for the medical marijuana

Sherrell normally relied upon to control his pain symptoms, which Sherrell believed would not be available to him during an upcoming period of incarceration. As noted above, Rigert described Sherrell as "a well developed male with minimal pain behaviors. . . [and] [b]right affect [who was] able to give an accurate and cogent description of recent events, [but who] [wa]s fairly elaborative when describing his discussions on expectations of chronic pain around the time of his orthopedic surgery." Tr. 273. Rigert reported that Sherell advised him "that he was told to expect chronic pain over the years, however, [Rigert's] experience with these injuries has been that they generally do fairly well. . . ." Tr. 273. Rigert opined that Sherrell had "some degree of atrophy in the right biceps compared to the left, however, they are both very well developed. He has limited abduction to 120 degrees on the right compared to the left. . . . Grip strength is 5/5/ biceps and 5/5 triceps." Tr. 273. Sherrell argues that the Administrative Law Judge improperly failed to address Rigert's opinion anywhere in her decision.

An ALJ may properly reject a treating physician's uncontradicted medical opinion only for "clear and convincing reasons." *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995). When the treating physician's opinion has been contradicted, however, it may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). This can be done by setting out a detailed and thorough summary of the facts, providing an appropriate interpretation thereof, and making findings. *See Megallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Here, Sherrell correctly notes that the ALJ failed to address Rigert's opinion in her decision. In addition, Sherrell characterizes Rigert's opinion as constituting "key objective

evidence of Mr. Sherrell's physical impairments at a time that would establish an onset date before his [date last insured]," and as constituting an opinion "that Mr. Sherrell suffered from chronic pain of an unknown etiology." However, Rigert did not in fact so opine, but rather opined that, because even complete acromioclavicular joint separation was unlikely to cause the extensive pain symptoms reported by Sherrell, the question whether there might be a different etiology for Sherrell's pain symptoms was raised. Tr. 273. In addition, Rigert characterized Sherrell's reports regarding previous diagnoses of continuing chronic pain as "elaborative" and expressly left the decision whether or not to prescribe the requested narcotic pain medications to treating physician Serra, opining only that such medications would not be contraindicated "if the history [provided by Sherrell] [wa]s correct." Tr. 273. Considered in their entirety, Rigert's examination notes establish that Rigert's opinion was not intended to be diagnostic in any degree, but rather to address treatment options only, and was furthermore expressly conditioned on the *arguendo* assumption that Sherrell's reporting was accurate (an assumption whose validity the notes expressly call into question). Tr. 273.

An ALJ is only required to discuss "significant probative evidence" in her detailed findings. *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984) (controverted medical opinion found to be neither significant nor probative), *quoting Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981). Rigert's medical opinion, which purports to offer no diagnosis and is expressly hedged on the accuracy of reports whose accuracy Rigert openly questioned, is neither specific nor probative. The ALJ therefore did not err by omitting to address Rigert's opinion. Moreover, even if Rigert's opinion were construed as both significant and probative, the ALJ's omission on that construal would necessarily have been no more than

harmless error, as the opinion, even if fully credited in every respect, provides no grounds for

modifying the ALJ's assessment of Sherrell's residual functional capacity in any way.  *See Burch*

*v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("[a] decision of the ALJ will not be reversed for

errors that are harmless"), *citing Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991).  The

Commissioner's decision therefore should not be disturbed on the basis of the ALJ's failure to

address Rigert's April 1, 2004, medical opinion.

### B.    April 30, 2009, Medical Opinion of Treating Physician Serra

Constance Serra, M.D., was Sherrell's treating physician for chronic pain and hepatitis

from some time in 2003 through not earlier than April 30, 2009.  As noted above, on April 30,

2009, Serra wrote a letter to Sherrell's attorney opining that:

> Regarding [Sherrell's] hepatitis C, he does have sort of a chronic low-grade
> fatigue and myalgias that most likely are related to the hepatitis C.  He has been
> very good about completely abstaining from alcohol and other liver toxins;
> therefore, his liver enzyme studies have improved over the years, which is good
> news.  However, he is still considered to have active hepatitis C.
>
> His other chronic ongoing issue is from a pretty severe motor vehicle accident of
> July 2007. . . .  He continues to have . . . chronic pain in his back with recurrent
> muscle spasm, and this is due to the nature of the injury.  This is likely going to be
> an ailment that will be an ongoing struggle for him for at least several years to
> come, if not a lifelong struggle to control the musculoskeletal spasm and pain.  He
> continues to engage in regular stretching exercises.  He uses no narcotic
> medications for pain because he does not tolerate narcotic medications well.  He
> does use medical marijuana to help with pain.
>
> Based on these two specific physical conditions, I believe it would be difficult for
> him to sustain long-term employment, as I do not see either condition having
> substantial improvement in the upcoming years.  I absolutely do not think he
> should return to his prior trade of carpentry and construction work due to the
> chronic musculoskeletal pain that is likely to be ongoing.

Tr. 413-414.  Sherrell argues that the Administrative Law Judge improperly rejected Serra's

opinion of April 30, 2009.

Page 26 - FINDINGS AND RECOMMENDATION

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced weight to the opinions of the claimant's treating physicians. *See* 20 C.F.R. § 404.1527(d)(2). Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques and is not inconsistent with other substantial evidence in the medical record, the treating physician's opinion is accorded controlling weight. *See id.* Moreover, even where a treating physician's opinion is contradicted by competent medical evidence, it is still entitled to deference. *See id.*; *see also, e.g., Orn v. Astrue*, 495 F.3d 625, 631-632 (9th Cir. 2007) (where a treating physician's opinion is contradicted by medical evidence in the record it is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527"), *quoting* S.S.R. No. 96-2p, 1996 SSR LEXIS 9. In consequence, an uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Notwithstanding the foregoing, no such deference is afforded a treating physician's opinion as to the ultimate issue of a claimant's disability or as to any other issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. However, medical opinions from a treating physician or any other source may not be simply ignored, even when they bear upon issues reserved to the Commissioner, but rather must be evaluated to determine the extent to which they are supported by evidence in the record. *See* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. Nevertheless, although the Commissioner is required to evaluate every medical opinion, the Commissioner is only required to discuss "significant

probative evidence" in his detailed findings. *Vincent on behalf of Vincent v. Heckler*, 739 F.2d

1393, 1394-1395 (9th Cir. 1984) (controverted medical opinion found to be neither significant

nor probative), *quoting Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981).

> Here, the ALJ addressed Serra's letter opinion of April 30, 2009, as follows:

> Dr. Serra wrote on April 30, 2009, describing the claimant's history of hepatitis C, diagnosed in 2006, as well as his treatment for musculoskeletal injuries sustained in a motor vehicle accident in July 2007. Dr. Serra opined that she did not believe he could return to his past work in the carpentry and construction trades, and that it would be "difficult" for him to sustain any long-term employment. She based her opinion on the fact that the claimant continues to complain of chronic back pain and muscle spasm, despite a variety of conservative treatment measures, and because she does not expect his condition to improve in the upcoming years. . . . As a treating medical source, Dr. Serra's opinions deserve serious consideration, because she has personally examined the claimant and has followed the course of the claimant's medical condition over a period of time.

> However, Dr. Serra did not provide objective evidence to substantiate her opinion or even explain how the claimant's impairments limited his ability to lift and carry, to sit, stand and walk, to perform postural or manipulative tasks or to fulfill the basic mental demands of full-time, remunerative, unskilled work. Indeed, she apparently relied heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. Because they are not well supported by medically acceptable clinical or laboratory diagnostic studies and are inconsistent with other substantial evidence in the case record, the undersigned concludes that Dr. Serra's opinions cannot be afforded significant weight.

Tr. 19. Regarding Sherrell's "subjective complaints" that constituted the data underlying Serra's

opinion, the ALJ found as follows:

> It is clear that the claimant does have underlying medical conditions that could reasonably result in the symptoms he alleges if he failed to follow his medical regimen or attempted to exceed his residual functional capacity as set forth above. However, the claimant's allegations as to the intensity, persistence and limiting effects of his symptoms are disproportionate and not supported by the objective medical findings or by any other corroborating evidence.

Page 28 - FINDINGS AND RECOMMENDATION

The record reflects [that] the claimant has received treatment for his allegedly disabling symptoms, which would normally weigh somewhat in his favor. However, it also reveals that the treatment has been essentially routine and conservative in nature, and has been generally successful in controlling those symptoms. Furthermore, the office visit notes reflect periods of time during which the claimant did not specify any particular complaint and relatively infrequent trips to the doctor for the allegedly disabling symptoms, which contrasts with the current claim of ongoing, disabling symptoms since the alleged onset date. The record shows that the claimant has missed appointments and failed to comply with the medical regimen prescribed by his treating doctors ([Tr. 292, 354], for example), which suggests that his symptoms may not have been as serious as has been alleged in connection with this application and appeal.

A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, and earned more than $5,000 per year only in 1987, 1996 and 1999. This raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. Moreover, as discussed earlier in this decision, the record reflects work activity after the alleged onset date. Furthermore, the claimant testified that he spends time working as a voluntary caregiver. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.

The record and the claimant's testimony also reflects that the claimant has engaged in the following daily activities: caring for himself without assistance, caring for his 15 year-old daughter, preparing simple meals daily, shopping in stores, managing his finances, reading, watching movies and television, walking, practicing yoga and kung fu, mushroom hunting and fishing, and socializing with friends ([Tr. 167-174, 195-202, 209-212]). The undersigned finds the claimant's activities of daily living consumed a substantial part of his day, and are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

Other matters that indicate to the undersigned that the information provided by the claimant concerning his symptoms generally may not be entirely reliable include a criminal history and doctor's notes ([Tr. 274, 311]). Those notes strongly suggest that the claimant has engaged in drug-seeking behavior, which involved exaggerating symptoms and limitations (the claimant reported to a medical source that his right shoulder and neck "were crushed" for example) ([Tr. 279-282]).

Although the claimant was reasonably articulate and appeared to be cognitively intact, he was a poor historian, hesitating for long periods before answering a question and requiring prompting for details. The claimant's responses while

Page 29 - FINDINGS AND RECOMMENDATION

testifying were evasive or vague at times, and left the impression that the claimant was less than entirely candid.  This suggests that the information provided by the claimant generally may not be entirely reliable.

Considering the entire case record, the claimant fails to convince the undersigned that he is so impaired that he cannot perform any kind of gainful work. Consequently, his subjective complaints are not found sufficiently credible to serve as additive evidence to support a finding of disability.

Tr. 17-18.[7]

Although Serra's letter opinion of April 30, 2009, states Serra's opinion that Sherrell suffered at that time from active hepatitis C (albeit apparently under good control based on dietary and other restrictions) and from chronic pain expected to remain ongoing for an indefinite period, it states only Serra's "belie[f] [that] it would be *difficult* for [Sherrell] to sustain long-term employment" rather than Serra's opinion that Sherrell would be *unable* to sustain any long-term employment (although it further states Serra's unequivocal opinion that Sherrell should not return to his prior employment as a carpenter or construction laborer).  Tr. 414 (emphasis supplied). Even if fully credited, Serra's letter opinion of April 30, 2009, therefore provides no basis for the conclusion that a finding of disability is warranted:  to establish disability within the meaning of the Act, a claimant must demonstrate an "*inability* to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months," and not merely that it would be *difficult* to sustain gainful employment.  42 U.S.C. § 423(d)(1)(A) (emphasis supplied).  As such, Serra's letter opinion is not probative of the ultimate issue of Sherrell's disability, and the ALJ would not have erred had she elected not to address it.  *See Vincent*, 739 F.2d at 1394-1395,

---

[7] Sherrell does not specifically challenge the Administrative Law Judge's findings regarding his credibility in reporting his subjective symptoms and limitations.

Page 30 - FINDINGS AND RECOMMENDATION

*quoting Cotter*, 642 F.2d at 706.

As noted above, the ALJ nevertheless did address the letter opinion at some considerable length, noting, first, that the letter opinion does not reference objective medical evidence, and second, that to the extent the opinion may be construed as resting on medical evidence of record, clear and compelling reasons exist for doubting the credibility of such evidence. Indeed, the ALJ provided a lengthy recitation of some of the many and varied indicia of unreliability in Sherrell's subjective reports of symptoms. Even if Serra's opinion were construed as probative of Sherrell's disability, the ALJ provided significant and legitimate reasons for rejecting it.

For the foregoing reasons, the Commissioner's decision should not be disturbed on the basis of the ALJ's rejection of Serra's opinion testimony.

## II. Step Five: Existence of Jobs the Claimant Could Perform in the National Economy

As noted above, Sherrell argues that the Administrative Law Judge erred in her assessment of his residual functional capacity. On that basis, Sherrell argues that the Commissioner failed to meet his burden at the fifth step of the five-step process to demonstrate that, in light of his residual functional capacity, Sherrell was capable of performing jobs existing in significant numbers in the national economy. However, as noted above, the ALJ either did not err or erred only harmlessly in her assessment of Sherrell's RFC. Specifically, the Commissioner was entitled to rely on the ALJ's finding that, despite the limitations listed in his RFC, Sherrell could perform occupations including machine tender (380,000 jobs in the national economy and 14,000 jobs in the Oregon economy) or sign painter (138,000 jobs in the national economy and 3,800 jobs in the Oregon economy). In consequence, the Commissioner met his burden at the fifth step of the five-step sequential process.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decisions in connection with Sherrell's applications for DIB and SSI benefits be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 31st day of May, 2011.

Honorable Paul Papak
United States Magistrate Judge